61 A.3d 136

IN THE MATTER OF ADVISORY LETTER NO. 7–11 OF
THE SUPREME COURT ADVISORY COMMITTEE ON
EXTRAJUDICIAL ACTIVITIES (A–12–11)(068633).

Argued November 27, 2012—Decided March 6, 2013.

*Frank E. Catalina* argued the cause for appellant George M. Boyd (*Margulies Wind*, attorneys; *George M. Boyd*, submitted a brief *pro se* ).

*Kim D. Ringler*, Deputy Attorney General, argued the cause for respondent Supreme Court of New Jersey Advisory Committee on Extrajudicial Activities (*Jeffrey S. Chiesa*, Attorney General, attorney).

Justice ALBIN delivered the opinion of the Court.

The figure of justice blindfolded, holding a scale equally balanced, is a common feature atop many courthouses. That symbol carries a simple message—all stand before the law as equals, and justice will be administered fairly and impartially. If the public is to keep faith in the ideals represented by that symbol, then it must have complete confidence in the integrity of the judges who administer our system of justice. That confidence will come only when judges are above reproach and suspicion in the eyes of those

who appear in their courtrooms. Appearances matter when justice is dispensed, and therefore public perception that a judge might be partial to one party over another—whether true or not—cannot be reconciled with the ideal of blind justice.

This case involves a long-serving and respected chief municipal court judge whose son has become a member of the police force in the same municipality where he presides. The issue is whether the judge may hear cases involving police officers who serve in the same police department as his son. We hold that, consistent with the canons of the *Code of Judicial Conduct* and our case law, he may not. That is so because a fully informed and reasonable person, particularly a litigant, could question the judge's ability to be impartial in issuing rulings on matters concerning his son's law enforcement colleagues. We therefore conclude that he may not hear cases involving police department officers and employees who serve with his son in the same municipality where he presides as a judge, nor may he act as the chief judge supervising other judges who hear such cases.

I.

A.

George M. Boyd has served as a municipal court judge in the City of Perth Amboy since 1991.[1] As the court's chief judge, he has exercised administrative responsibilities and has supervised two other municipal court judges. Together, all three judges hold at least six court sessions each week in the Perth Amboy Municipal Court. No one has raised any question about Judge Boyd's ability or integrity during his years of service on the bench. The sole issue is whether his son's appointment as a police officer in Perth Amboy creates either a conflict or the appearance of a conflict of interest in Judge Boyd's presiding over cases involving the Perth Amboy Police Department.

---

[1] He also serves as a municipal court judge in Monroe Township.

In July 2010, Ethan Boyd, the judge's then twenty-seven year-old son, was sworn in as a police officer in the Perth Amboy Police Department, and, after training at the police academy, entered active service on January 1, 2011. Officer Boyd was born, raised, and educated in Perth Amboy, but had not resided with his parents in the five years preceding his employment as a police officer.

During the week of his son's swearing-in ceremony, Judge Boyd advised Middlesex County Assignment Judge Travis Francis of his son's appointment as a Perth Amboy police officer. By letter dated November 17, 2010, Judge Boyd expressed to Judge Francis his intent to disqualify himself from any case involving his son. He left to Judge Francis to decide whether his son's cases should be assigned to the other two Perth Amboy Municipal Court judges or transferred to a judge of a neighboring municipal court. On December 1, 2010, Judge Francis informed Judge Boyd that "all cases involving [his] son shall be transferred to a neighboring court for disposition."

On March 1, 2011, based on his reading of Administrative Directive # 1–92 (Jan. 1, 1992), Judge Francis expressed to Judge Boyd that a "conflict" existed that required "his resignation from the Perth Amboy Municipal Court bench." Directive # 1–92 is entitled "Supreme Court Policy Governing Municipal Court Administrators and Deputy Administrators Who are Married To or are the Parents or Children of Police Officers." The Directive, among other things, prohibits the appointment of a municipal court administrator or deputy court administrator whose child is a police officer in the same municipality. *Ibid.* Under the Directive, an administrator is not subject to removal if, after appointment, the administrator's "child becomes a police officer." *Ibid.* In that circumstance, however, the administrator is disqualified from any involvement in a matter concerning his or her child. *Ibid.*

Judge Boyd took the position that Directive # 1–92 did not apply to municipal court judges. Ten days later, Judge Francis requested by email that the Advisory Committee on Extrajudicial

Activities (Advisory Committee) render an opinion on the issue.[2] On March 17, 2011, Judge Boyd wrote to the Committee, explaining that Directive # 1–92 "dealt specifically with court administrators and deputy court administrators" and that he was unaware of any "directive which deals directly with a similar issue involving municipal court judges." Alternatively, he noted that even if Directive # 1–92 did apply, his son became "a police officer after [his] continual appointment and service as a municipal judge." Last, he emphasized that the steps taken to transfer cases involving his son served to "cure any conflict."

### B.

On April 8, 2011, the Committee issued to Judge Francis—the requestor—Advisory Letter No. 7–11. The Advisory Committee expressed its opinion that Judge Boyd could "not continue to serve as the Chief Municipal Court Judge in the same municipality where his son is a police officer." In the Committee's view, "transferring the son's cases out of the municipality [did] not serve to rectify the conflict." Ultimately, "the Committee believe[d] that because the conflict arises from a direct familial relationship with law enforcement, the appearance of partiality or bias is too great to overcome." In reaching that conclusion, the Committee relied on the canons of the *Code of Judicial Conduct*, in particular Canon 2 ("A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities.") and Canon 2(A) ("A judge should . . . act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.").

---

[2] The Supreme Court appoints the members of the Advisory Committee. *R.* 1:18A–1. As of March 2011, the Committee was composed of seven sitting judges, two retired judges, a practicing attorney, and a public member. The Advisory Committee "accepts inquiries concerning extrajudicial activities" from judges. *R.* 1:18A–2. "In every matter, the secretary [of the Committee] shall convey the Committee's response in writing to the judge making the inquiry. Such written response to the judge shall be in the form of an informal opinion." *R.* 1:18A–4.

On April 14, Judge Francis provided the Advisory Letter to Judge Boyd and then contacted the Committee to determine whether Judge Boyd's resignation as the chief judge of the municipal court would put him in compliance with the *Code of Judicial Conduct*. That same day, the Committee responded that, in its view, "Judge Boyd may neither sit as the Chief Municipal Court Judge nor as Municipal Court Judge in Perth Amboy where his son also serves as a police officer."

Judge Boyd then filed with the Committee a request for reconsideration of Advisory Letter No. 7–11. *See R.* 1:18A–6. Judge Boyd noted again that Directive # 1–92 only requires disqualification, not removal, of a court administrator whose child becomes a police officer. Judge Boyd urged the Committee to consider that its "advisory opinion would ... have [an] 'excessively severe' and profound impact upon [his] personal life and economic livelihood," (quoting Directive # 1–92).

The Advisory Committee did not modify its earlier opinion. It advised Judge Boyd that he "may not continue to serve as a Municipal Court judge, even without supervisory responsibilities, in the same municipality where [his] son is a police officer." The Committee hewed to the position that Judge Boyd's "close familial relationship with law enforcement in the same municipality" where he sits as a judge gives rise to an irremediable conflict of interest. The Committee maintained that "the potential for the appearance of a lack of impartiality or bias is too great to overcome."

We granted Judge Boyd's petition for review. *IMO Advisory Letter No. 7–11 of the Supreme Court Advisory Comm. on Extrajudicial Activities,* 212 *N.J.* 570, 58 *A.*3d 1175 (2011).

## II.

### A.

Judge Boyd argues that the Advisory Committee's opinion "fails to take into consideration the profound impact, both economic and professional, that the opinion would have on [him] and,

tangentially, on [his] police officer son." He maintains that "the simple and traditional expedient" of having all three Perth Amboy Municipal Court judges disqualify themselves from hearing matters involving his son "completely cure[s]" any potential appearance of partiality. He does not believe that there is a "logical basis to assume that an appearance of bias or partiality could arise" from his hearing cases involving other Perth Amboy police officers—cases in which his son has played no part.

The ultimate question, based on our jurisprudence, is whether a reasonable person, fully informed that Judge Boyd's son is a Perth Amboy police officer—say, a defendant charged with a violation or offense by a Perth Amboy police officer who will testify against him—would have doubts about Judge Boyd's impartiality in deciding the case. The answer to that question is important not only to Judge Boyd, but also to the public whose most frequent contact with our judicial system is in municipal court.

## B.

Each year, the only experience that millions of New Jersey residents and non-residents will have with our judicial system will be in our municipal courts. *State v. McCabe*, 201 *N.J.* 34, 42, 987 *A.*2d 567 (2010) (citing *In re Mattera*, 34 *N.J.* 259, 275, 168 *A.*2d 38 (1961)). Because for most members of the public, municipal court "is the court of first and last resort," *In re Samay*, 166 *N.J.* 25, 43–44, 764 *A.*2d 398 (2001), "municipal court judges are the face of the Judiciary," *McCabe, supra*, 201 *N.J.* at 42, 987 *A.*2d 567. The public will pass judgment on our entire justice system based primarily on their impressions of the judges who preside in our municipal courts. *See ibid.* Certainly, the public will lose faith in our justice system if it believes that judges are hearing cases despite conflicting interests that strain their ability to be impartial. The mere appearance of bias in a judge—however difficult, if not impossible, to quantify—is sufficient to erode respect for the judiciary. *See DeNike v. Cupo*, 196 *N.J.* 502, 514, 958 *A.*2d 446 (2008). To that end, judges must " 'refrain . . . from sitting in any

causes where their objectivity and impartiality may fairly be brought into question.'" *Ibid.* (quoting *State v. Deutsch,* 34 *N.J.* 190, 206, 168 *A.*2d 12 (1961)).

 ▮ Therefore, "ensuring both conflict-free, fair hearings and the appearance of impartiality in municipal court is vital" to maintaining public confidence in our system of justice. *McCabe, supra,* 201 *N.J.* at 42, 987 *A.*2d 567. To accomplish that goal, we have in place exacting standards of judicial conduct to which we now turn.

### C.

 ▮ All judges in New Jersey must abide by the *Code of Judicial Conduct. R.* 1:18.[3] The Code is comprised of seven canons that provide both broad and specific standards governing the conduct of judges. *Code of Judicial Conduct,* Pressler & Verniero, *Current N.J. Court Rules,* Appendix to Part 1 at 481 (2013). The canons set a high bar by which judges must guide themselves. They are not just aspirational yearnings but enforceable rules, and they certainly "are not mere platitudes." *In re Seaman,* 133 *N.J.* 67, 95, 627 *A.*2d 106 (1993). The overarching objective of the *Code of Judicial Conduct* is to maintain public confidence in the integrity of the judiciary. *Id.* at 96, 627 *A.*2d 106. A review of the relevant canons and accompanying commentary will shed light on their application to this case.

Canon 1, in part, proclaims that a judge "should personally observe [ ] high standards of conduct so that the integrity and independence of the judiciary may be preserved." This canon recognizes that judges are the personification of the judicial system and that public respect for that system depends on how jurists comport themselves on and off the bench.

---

[3] Administrative Directive # 1–92, which was the subject of much discussion between Judge Boyd and Judge Francis, applies to municipal court administrators, and not municipal court judges, and therefore is not part of our analysis.

Correspondingly, Canon 2 exhorts judges to avoid "the Appearance of Impropriety in All Activities." Canon 2 provides that a judge "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," Canon 2(A), and "should not allow family, social, political, or other relationships to influence judicial conduct or judgment," Canon 2(B). The commentary to Canon 2 emphasizes that judges must be sensitive to public perception. Thus, a judge must avoid even the "appearance of impropriety and must expect to be the subject of constant public scrutiny." *Code of Judicial Conduct, supra,* comment on Canon 2. Additionally, judges must "accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." *Ibid.*

Canon 3(C) counsels judges on when recusal is appropriate. Canon 3(C)(1) instructs that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably* be questioned." (Emphasis added). For instance, disqualification is mandated whenever a "judge has a personal bias ... concerning a party." Canon 3(C)(1)(a). Moreover, a judge must disqualify himself if a close relative,[4] such as a son, "is a party to the proceeding," Canon 3(C)(1)(e)(i), "is known by the judge to have an interest that could be affected by the outcome of the proceeding," Canon 3(C)(1)(e)(iii), or "is to the judge's knowledge likely to be a witness in the proceeding," Canon 3(C)(1)(e)(iv).

*Rule* 1:12–1, cited by Canon 3(C), provides additional guidance on disqualification when close relatives are parties or attorneys in a case.[5] A "judge of any court shall be disqualified on the court's

---

[4] We refer to a close relative for ease of reference. Canon 3(C)(1)(e) uses the more precise term of "a person within the third degree of relationship to either" the judge or the judge's spouse.

[5] The disqualification rule applies "if the judge (a) is by blood or marriage the second cousin of or is more closely related to any party to the action; [or] (b) is

own motion and shall not sit in any matter, if" his or her child is either a party or an attorney in an action. *R.* 1:12–1(a) and (b). Where the judge's child is an attorney in a firm or office, disqualification is also mandated in cases involving "the partners, employers, employees or office associates of any such attorney except where the Chief Justice for good cause otherwise permits." *R.* 1:12–1(b).

For example, under *Rule* 1:12–1(b), an Essex County trial judge, whose son was an assistant prosecutor in the same county, was required to disqualify himself from hearing criminal cases presented by the Essex County Prosecutor's Office. *State v. Connolly,* 120 *N.J.Super.* 511, 514–15, 295 *A.*2d 204 (App.Div.), *certif. denied,* 62 *N.J.* 88, 299 *A.*2d 86 (1972). It made no difference that "the judge's son never participated in any way in the preparation of the case or the conduct of the trial." *Id.* at 515, 295 *A.*2d 204. The disqualification provision of *Rule* 1:12–1(b) applied because "[t]he judge's son was, at least, an office associate of the attorney who tried the case for the prosecutor." *Ibid.*

The final catch-all provision, *Rule* 1:12–1(g), requires judges to disqualify themselves "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." *Rule* 1:12–1(g)—like Canon 3(C)(1), which mandates disqualification when a "judge's impartiality might reasonably be questioned"—is intended to apply to scenarios that cannot be neatly catalogued. *See State v. Tucker,* 264 *N.J.Super.* 549, 554, 625 *A.*2d 34 (App.Div.1993) ("The situations in which a judge should grant a motion for recusal are varied . . . ."), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994). Thus, "[n]either Canon 3C nor *Rule* 1:12–1 recite an exclusive list of circumstances which disqualify a judge and require recusal from a matter." *State v. Kettles,*

---

by blood or marriage the first cousin of or is more closely related to any attorney in the action." *R.* 1:12–1(a) and (b).

345 *N.J.Super.* 466, 470, 785 *A.2d* 925 (App.Div.2001), *certif. denied*, 171 *N.J.* 443, 794 *A.2d* 182 (2002).

This Court has also adopted *Guidelines for Extrajudicial Activities* (1987), *available at* http://njlegallib.rutgers.edu/misc/Extra Judicial_Guidelines_1995.pdf ("Guidelines") to implement the *Code of Judicial Conduct*. Significantly, consonant with Canon 3(C)(1) and *Rule* 1:12–1(g), the Guidelines instruct judges to "always guard against the appearance of bias or partiality or the perception of prejudgment of issues likely to come before them." Guideline II.B.

Judges can find further direction through ethical thickets by referring to a booklet entitled *Annotated Guidelines for Extrajudicial Activities* (Nov.2007), *available at* http://njlegallib.rutgers.edu/misc/Extrajudicial_Guidelines_2007.pdf. The booklet catalogues a summary of opinions issued by the Advisory Committee. Many of those opinions carry a clear theme—judges must avoid any appearance of having a special relationship or an entangling alliance with law enforcement. *See, e.g., id.* at 25, *Opinion 19–88* ("Judges may not attend a dinner to honor a prosecutor. . . . Attendance might create an appearance of favoring law enforcement."); *id.* at 4, *Opinion 71–94* ("Superior Court judge may not assist a police department in developing a training video for their officers. . . ."); *id.* at 29–30, *Opinion 24–00* (finding that municipal court judge should not attend retirement dinner for police chief of same municipality as attendance "undermines the structural separation of the court from the police that is necessary to preserve the appearance of [the court's] independence and impartiality"); *id.* at 6, *Opinion 16–04* (finding that municipal court judge serving as hearing officer for internal police disciplinary actions in different municipality "could create the appearance of bias or partiality").

 It is clear from the canons of the *Code of Judicial Conduct*, the Court Rules, and the *Guidelines for Extrajudicial Activities* that " 'justice must satisfy the appearance of justice.' " *Deutsch, supra,* 34 *N.J.* at 206, 168 *A.*2d 12 (quoting *Offutt v.*

*United States,* 348 *U.S.* 11, 14, 75 *S.Ct.* 11, 13, 99 *L.Ed.* 11, 16 (1954)). The purpose of our judicial disqualification provisions "is to maintain public confidence in the integrity of the judicial process, which in turn depends on a belief in the *impersonality* of judicial decision making." *United States v. Nobel,* 696 *F.*2d 231, 235 (3d Cir.1982) (emphasis added), *cert. denied,* 462 *U.S.* 1118, 103 *S.Ct.* 3086, 77 *L.Ed.*2d 1348 (1983). Even a "righteous judgment" will not find acceptance in the public's mind unless the judge's impartiality and fairness are above suspicion. *State v. Muraski,* 6 *N.J.Super.* 36, 38, 69 *A.*2d 745 (App.Div.1949). "In other words, judges must avoid acting in ... a manner that may be *perceived* as partial," otherwise the integrity of the judicial process will be cast in doubt. *DeNike, supra,* 196 *N.J.* at 514, 958 *A.*2d 446.

## D.

In summary, disqualification is mandated if a "judge's impartiality might reasonably be questioned," Canon 3(C)(1), or if there is a basis "which might reasonably lead counsel or the parties to believe" that the judge is unable to render a "fair and unbiased ... judgment," *R.* 1:12–1(g). Thus, judges must " 'refrain ... from sitting in any causes where their objectivity and impartiality may fairly be brought into question.' " *DeNike, supra,* 196 *N.J.* at 514, 958 *A.*2d 446 (quoting *Deutsch, supra,* 34 *N.J.* at 206, 168 *A.*2d 12). Those principles have been distilled to a simple question: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" *Id.* at 517, 958 *A.*2d 446.

We now apply the facts of this case to that question.

## III.

### A.

As a judge of the Perth Amboy Municipal Court, Judge Boyd presides over cases involving violations of state motor vehicle laws and municipal ordinances, provisions of the New Jersey Code of

Criminal Justice, and other laws. *See McCabe, supra,* 201 *N.J.* at 41–42, 987 *A.*2d 567. The vast majority of those cases will be initiated when a Perth Amboy police officer files a summons or complaint. Further, in most of those cases Perth Amboy police officers will offer testimony, which, if believed, will lead to a conviction. Depending on the nature of the conviction, a municipal court judge may have authority to impose a jail sentence, a license suspension, a significant fine, and/or restitution.

Would a reasonable, fully informed person, knowing that Judge Boyd's son is a Perth Amboy police officer, have doubts about Judge Boyd's impartiality in deciding a case that pits the credibility of a Perth Amboy police officer against that of a litigant? We believe that the answer to that question is yes. If a Superior Court judge, whose son is an Assistant Prosecutor, must disqualify himself from a criminal case presented by an Assistant Prosecutor who works in the same office as his son, *Connolly, supra,* 120 *N.J.Super.* at 514–15, 295 *A.*2d 204, the same result should apply with equal if not greater force in this case. It is true that in *Connolly* the judge faced the explicit disqualification provisions of Canon 3(C)(1)(e)(ii) and *Rule* 1:12–1(b) because his son was a *lawyer* in the prosecutor's office. *Connolly, supra,* 120 *N.J.Super.* at 514, 295 *A.*2d 204. But the logic of *Connolly* is at least as compelling in its application to a municipal court judge whose son is a police officer in the same municipality where he presides. Moreover, *Connolly* applied to a judge hearing a jury trial. *Id.* at 515, 295 *A.*2d 204. Municipal court judges, such as Judge Boyd, are the actual fact-finders.

In his capacity as a municipal court judge trying routine cases involving police witnesses, Judge Boyd must render final judgment on the credibility of his son's colleagues, some of whom may be his supervisors, others of whom may be his partners on patrol, and many of whom may be his friends. In some instances, Judge Boyd might have to issue adverse rulings against the police department that would be extremely displeasing to Officer Boyd's fellow officers. It would not be unnatural for any father to ponder

the consequences of his decisions on the life and career of his son—even if he were to do his best to disregard such extraneous considerations in deciding a case. It is the appearance of the conflict between public duty and filial ties that will strain public confidence in the integrity of the judicial process.

The issue is not whether Judge Boyd can faithfully maintain impartiality in cases involving Perth Amboy police officers who serve with his son. The workings of his mind cannot be put on display. That is why public perception matters. Judges must appear to be impartial, for in a democracy the standing of our system of justice depends on the people's confidence in the judicial process. In any particular case, Judge Boyd will have to decide whether to accept the credibility of a citizen-litigant over that of a Perth Amboy police officer. Will the litigant reasonably believe that, given Judge Boyd's filial ties to the Perth Amboy Police Department, he will receive a fair shake or that the scales of justice are tilted against him? Ultimately, a litigant should not be left to wonder about the judge's objectivity or impartiality.

The separation between our municipal court judges and the local law enforcement authorities must be as near complete as possible, a point made clear in opinions issued by the Advisory Committee on Extrajudicial Activities. If a "judge's impartiality might reasonably be questioned," disqualification is mandated. Canon 3(C)(1); *accord DeNike, supra,* 196 *N.J.* at 517, 958 *A.*2d 446. We believe that Judge Boyd's involvement in cases involving either his son or his son's colleagues on the police force might raise "reasonable questions in the minds of litigants and the public about the fairness of the proceedings and the overall integrity of the process." *See McCabe, supra,* 201 *N.J.* at 46, 987 *A.*2d 567.

Accordingly, Judge Boyd may not sit on any case involving the Perth Amboy Police Department nor may he serve as Chief Judge supervising the two judges who adjudicate matters pertaining to Perth Amboy Police Department officers and employees.

## B.

Judges must comply with extremely high standards of conduct, on and off the bench. To be sure, meeting those standards imposes considerable personal and professional burdens on members of the judiciary—burdens that may require significant sacrifices by judges and their families. Those standards are for the benefit of the public whom we, as judges, serve in administering our system of justice. By requiring disqualification whenever a fully informed person might reasonably question the impartiality of a judge, we guarantee that the judicial process will retain its high, preferred place in our democracy.

## IV.

We agree with the Advisory Committee on Extrajudicial Activities and hold that Judge Boyd may not serve as Chief Judge of the Perth Amboy Municipal Court or hear any cases involving the Perth Amboy Police Department or its employees. Judge Boyd may continue to preside over other matters. The municipality and Judge Boyd are in the best position to decide whether his continued presence on the court is warranted to handle the remaining cases, including conflict cases transferred to the Perth Amboy Municipal Court from other municipalities.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON, Judges RODRIGUEZ (t/a) and CUFF (t/a)—7.

*Opposed*—None.