SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### In the Matter of Raymond A. Reddin, Judge of the Superior Court (D-123-13) (074439)
### In the Matter of Gerald Keegan, Judge of the Municipal Court (D-124-13) (074440)

**Argued September 23, 2014 -- Decided January 21, 2015**

**RABNER, C.J., writing for a unanimous Court.**

In this judicial disciplinary matter, the Court considers two questions: (1) what the appropriate standard should be to measure whether a judge's personal behavior presents an appearance of impropriety; and (2) whether respondents – two sitting judges – violated that standard by regularly dining in public with a longstanding friend who was under indictment for official misconduct.

This matter came before the Court on a Presentment from the Supreme Court Advisory Committee on Judicial Conduct (ACJC or Committee). The facts are not in dispute.

In 2000, a group of friends began gathering weekly on Thursday evenings for dinner at a local restaurant followed by Mass at a nearby church. The group included Respondent Raymond Reddin, a Judge of the Superior Court in the Passaic vicinage since 2003, who was assigned to the Criminal Division; Respondent Gerald Keegan, a part-time Municipal Court Judge for the City of Paterson since 2004; Anthony Ardis, now the former Director of Management Services and Clerk to the Board of the Passaic Valley Sewerage Commission (PVSC); and others. Judge Reddin has been close friends with Ardis for fifty years; Judge Keegan and Ardis have been friends since about 1985. In February 2011, Ardis was arrested and charged with official misconduct, based on allegations that he used his public position to have subordinates perform home improvement projects for his friends and family using public resources. In June 2011, a State Grand Jury indicted Ardis, charging him with official misconduct, conspiracy, and theft by unlawful taking. Respondents knew that Ardis was under indictment for criminal offenses pending in Passaic County, and, at the same time, their group continued to meet weekly for dinner and Mass. Neither Judge considered whether their attendance raised any ethical concerns.

On Thursday, September 13, 2012, Judge Reddin, Judge Keegan, Ardis, and several others met for their weekly dinner at a restaurant in Passaic County. They dined outside on the patio in front of the restaurant. The same evening, a local Republican organization hosted a dinner at the restaurant and one of the guests (the grievant) recognized Judge Reddin and Ardis. The grievant later learned that Respondent Keegan, also seen dining with Ardis, was a Municipal Court Judge. The grievant knew that Ardis was under indictment and, days later, relayed his concerns via email to the Lieutenant Governor. The matter was referred to the Division of Criminal Justice, which, after interviewing the grievant, referred the matter to the ACJC for investigation. Although Respondents continued to dine with Ardis until the spring of 2013, they voluntarily stopped doing so as soon as they learned about the grievance from the ACJC. Both Respondents fully cooperated with the Committee's investigation.

On September 17, 2013, the ACJC issued a formal complaint against each Respondent, accusing both of creating "an appearance of impropriety that had the potential to weaken public confidence in the integrity and impartiality of the Judiciary," in violation of Canons 1 and 2A of the Code of Judicial Conduct, and of "demean[ing] the judicial office," contrary to Canon 5A(2). Respondents filed answers and admitted the essential facts alleged. The ACJC conducted formal hearings on March 25, 2014, and, on June 11, 2014, issued a Presentment finding no improper motive on the part of either Judge. However, relying on In re Blackman, 124 N.J. 547, 552 (1991), the ACJC concluded that Respondents violated Canons 1, 2A, and 5A(2) of the Code of Judicial Conduct. Based on several mitigating factors – including the Judges' unblemished judicial careers and their voluntary decision to stop attending the dinners – the ACJC recommended the least severe measure of public discipline, a public admonition.

The Court entered an order to show cause, pursuant to Rule 2:15-17(b)(2), and both Judges appeared and presented arguments to the Court.

**HELD**: The Court revises the standard to assess whether a judge's personal behavior creates an appearance of impropriety, and adds an element of objective reasonableness to the test. The Court adopts the following new standard: "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" Applying that standard, the Court finds by clear and convincing evidence that respondents violated Canons 1, 2A, and 5A(2) of the Code of Judicial Conduct, but imposes no sanctions in light of the Court's revision of the applicable standard.

1. Canon 1 of the Code of Judicial Conduct highlights the "bedrock principle" that "a judge should uphold the integrity and independence of the Judiciary." DeNike v. Cupo, 196 N.J. 502, 514 (2008). The Canon requires judges to maintain, enforce, and "personally observe high standards of conduct." Code of Judicial Conduct, Canon 1. Canon 2 directs judges to "avoid impropriety and the appearance of impropriety in all activities." The Canon adds that judges "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Code of Judicial Conduct, Canon 2A. That obligation extends to judges' private lives. Canon 5 instructs judges to conduct their extra-judicial activities in a way that "minimize[s] the risk of conflict with judicial obligations" and does not "demean the judicial office." Code of Judicial Conduct, Canons 5, 5A(2). (pp. 9-10).

2. For many years, New Jersey's Code of Judicial Conduct has examined judges' behavior by asking whether there is "a fair possibility that some portion of the public might [be] concerned" about the conduct in question. In re Blackman, 124 N.J. 547, 552 (1991). Under that standard, it has not mattered whether the concern was reasonable. Blackman, supra, 124 N.J. at 552-53 (judge had "a duty to foresee that his actions might be open to criticism by the press or members of the public," whether or not the public's interpretation was reasonable, or misinterpreted the judge's motives). In this matter, the ACJC followed that rule and relevant case law from this Court to measure Respondents' behavior. (pp. 10-12)

3. A majority of states, the District of Columbia, and the federal courts, follow a different course. As part of their analysis, they consider whether the public's perception of impropriety is objectively reasonable. Recent case law in our State on the subject of recusal has also invoked a more objective measure to evaluate possible conflicts of interest. In DeNike, supra, the Court considered whether "a reasonable, fully informed person [would] have doubts about the judge's impartiality." 196 N.J. at 517. The DeNike standard is not a perfect fit to assess a jurist's personal conduct off the bench for a simple reason: it is impractical to expect that members of the public who briefly observe a judge's behavior in public could be fully informed about the underlying facts. However, a standard that does not consider notions of "reasonableness," can invite different problems. Ethical principles meant to guide judges cannot depend on unreasonable judgments reached by a few, even if such inferences are possible. (pp. 13-18)

4. To address those concerns, as well as the weight of authority from other jurisdictions, the Court modifies the Blackman standard and adds an element of objective reasonableness, adopting the following standard: "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" That approach appropriately protects the reputation of the Judiciary and, by extension, the public. It also is fairer to judges, who can better anticipate the meaning of the more familiar test. In addition, a standard that focuses on reasonable concerns will help prevent frivolous complaints against judges and protect the integrity of the disciplinary process. In the end, an objective test will both benefit the public, whom judges serve in administering our system of justice, and sustain confidence in the Judiciary. (pp. 19-20)

5. Applying the objective standard here, respondents violated Canons 1, 2A, and 5A(2) of the Code of Judicial Conduct. By socializing in public with a defendant who awaited trial on criminal charges, in the very courthouse in which one of the Respondents served as a criminal judge, both Judges in this matter reasonably called into question their impartiality and weakened the public's confidence in the judicial system. That said, each Judge has an unblemished record and neither engaged in actual impropriety. Because the Court now revises the standard to assess a judge's personal behavior, the Court declines to impose sanctions in this case. In an effort to offer guidance for the future, the Court emphasizes that going forward, the circumstances presented would result in the imposition of discipline under the new standard. (pp. 20-24)

     **JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.**

IN THE MATTER OF

RAYMOND A. REDDIN,

A Judge of the Superior Court

_____

IN THE MATTER OF

GERALD KEEGAN

A Judge of the Municipal Court

Argued September 23, 2014 – Decided January 21, 2015

On an Order to show cause why respondents should not be publicly disciplined through the imposition of an appropriate sanction that does not include removal from judicial office.

Tracie H. Gelbstein, Disciplinary Counsel, argued the cause on behalf of the Advisory Committee on Judicial Conduct.

Raymond B. Reddin argued the cause for respondent Raymond A. Reddin (Reddin Masri, attorneys).

Clark L. Cornwell, III, argued the cause for respondent Gerald S. Keegan.

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This disciplinary case raises two questions:  (1) what the appropriate standard should be to measure whether a judge's personal behavior presents an appearance of impropriety; and, (2) whether Respondents -- two sitting judges -- violated that standard by regularly dining in public with a longstanding friend who was under indictment for official misconduct.

To the public, judges embody the court system.  As a result, their conduct -- both on and off the bench -- can promote as well as erode confidence in the Judiciary.  For that reason, the ethical principles that guide judges' behavior extend not only to the performance of their official duties but also to their personal lives.

For many years, New Jersey's Code of Judicial Conduct has examined judges' behavior by asking whether there is "a fair possibility that some portion of the public might [be] concerned" about the conduct in question.  In re Blackman, 124 N.J. 547, 552 (1991).  Under that standard, it has not mattered whether the concern was reasonable.  Ibid.

Most state courts, as well as the federal judiciary, follow a different course.  As part of their analysis, they consider whether the public's perception of impropriety is objectively reasonable.  Because we believe that approach is fair, offers better guidance to judges, and will protect both the public and the reputation of the Judiciary, we adopt the following standard

2

to assess whether a judge's personal behavior creates an appearance of impropriety:  "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?"

Applying that standard to the facts here, we conclude that Respondents violated Canons 1, 2A, and 5A(2) of the Code of Judicial Conduct.  By socializing in public with a defendant who awaited trial on criminal charges, in the very courthouse in which one of the Respondents served as a criminal judge, both Judges in this matter reasonably called into question their impartiality and weakened the public's confidence in the judicial system.  That said, we recognize that each Judge has an unblemished record and that neither engaged in any actual impropriety.  Because we now revise the standard to assess a judge's personal behavior, we decline to impose any sanctions in this case.

I.

The facts are not in dispute.  In or about 2000, a group of friends began gathering weekly on Thursday evenings.  They routinely met for dinner at a local restaurant and attended Mass together afterward at a nearby church.  The group included Respondent Raymond Reddin, a Judge of the Superior Court in the Passaic vicinage since 2003, who was assigned to the Criminal Division at all relevant times; Respondent Gerald Keegan, a

3

part-time Municipal Court Judge for the City of Paterson since 2004; Anthony Ardis; and others. Judge Reddin and Ardis have been close friends for fifty years; Judge Keegan and Ardis have been friends since about 1985.

Ardis is the former Director of Management Services and Clerk to the Board of the Passaic Valley Sewerage Commission (PVSC). On February 1, 2011, he was arrested and charged with official misconduct. He allegedly used his public position to have subordinates perform home improvement projects -- while on agency time and with agency tools and equipment -- at the homes of a relative and friend. A State Grand Jury indicted Ardis on June 29, 2011, and charged him with official misconduct, conspiracy, and theft by unlawful taking of PVSC property. Various media outlets reported on Ardis's arrest and indictment, and some reports included his photograph.

Judge Reddin and Judge Keegan both knew that Ardis was under indictment for criminal offenses pending in Passaic County. At the same time, the group to which they belonged continued to meet on Thursday evenings. (Judge Keegan did not attend for a period of time for health reasons.) Neither Judge considered whether their attendance raised any ethical concerns.

On Thursday, September 13, 2012, Judge Reddin, Judge Keegan, and Ardis, along with several others, had dinner at a restaurant they often frequented in Woodland Park, in Passaic

4

County.  The group sat at their preferred place -- a table on the outside patio in front of the restaurant.

The same evening, a local Republican organization hosted a dinner upstairs at the restaurant.  One of the guests at that event (the grievant) spotted and recognized Judge Reddin and Ardis dining together with others.  The grievant later learned that another one of the diners he saw was Respondent Keegan, a Municipal Court Judge.

The grievant knew that Ardis was under indictment and, days later, relayed his concerns to the Lieutenant Governor.  In an email, the grievant explained that he observed Respondents, Ardis, and others at the restaurant and added,

> [w]hat gives me cause for concern is the fact that Ardis is awaiting trial in Passaic County Superior Court relating to an indictment alleging official misconduct.  I was also told by an employee at the restaurant that these men meet there "all the time."
>
> It seems inappropriate for a Superior Court Judge to be meeting with an individual under indictment and awaiting trial in the jurisdiction in which he is a sitting judge.

The matter was referred to the Division of Criminal Justice.  After the Division interviewed the grievant, it referred the matter to the Advisory Committee on Judicial Conduct (ACJC or Committee).

The ACJC, in turn, investigated the complaint.  Although Respondents continued to dine with Ardis and the group until the

5

spring of 2013, they voluntarily stopped doing so as soon as they learned about the grievance from the ACJC. Both Respondents fully cooperated with the investigation.

On September 17, 2013, the ACJC issued a formal complaint against each Respondent. The complaint recounted the above facts and accused both Judges of creating "an appearance of impropriety that had the potential to weaken public confidence in the integrity and impartiality of the Judiciary," in violation of Canons 1 and 2A of the Code of Judicial Conduct, and of "demean[ing] the judicial office," contrary to Canon 5A(2).

Judge Reddin and Judge Keegan each filed answers and admitted the essential facts alleged. But they both requested that the ACJC find that their conduct had not violated the Code of Judicial Conduct. Each Respondent and the Presenter also entered into a detailed stipulation of facts.

The ACJC conducted separate formal hearings on March 25, 2014. The stipulations as well as transcripts of interviews of both Judges, the restaurant's owner, and two staff members at the restaurant were admitted in evidence.

On June 11, 2014, the ACJC issued a Presentment. It found no improper motive on the part of either Judge. The Presentment concluded, however, that Judge Reddin's and Judge Keegan's

6

> continued association with Mr. Ardis following
> his arrest and indictment created more than a
> "fair possibility" that some portion of the
> public might conclude that Respondents tacitly
> endorsed Mr. Ardis's innocence, disagreed with
> the criminal justice system that indicted him,
> or worse, assisted Mr. Ardis with his criminal
> court matter.
>
> [(Citing Blackman, supra, 124 N.J. at 552).]

The ACJC accordingly found that both Judges violated Canons 1, 2A, and 5A(2) of the Code of Judicial Conduct. In addition, the Committee found a number of mitigating factors -- including the Judges' unblemished judicial careers and their voluntary decision to stop attending the dinners -- and recommended the least severe measure of public discipline, a public admonition.

We issued an order to show cause, pursuant to Rule 2:15-17(b)(2), and both Judges appeared and presented arguments to the Court.

## II.

Judge Reddin argues that the Blackman standard is flawed. He contends that the current test to determine whether an appearance of impropriety exists is "too subjective, overbroad, and vague," and therefore "fails to provide guidance to Judges." He also maintains that his weekly tradition of having dinner and going to church with a lifelong friend did not create an appearance of impropriety. He acknowledges, however, that an uninformed or unreasonable person might misinterpret his

7

behavior and erroneously conclude it was improper.  He also requests that the Court not impose any discipline.

Judge Keegan similarly challenges the current standard to assess an appearance of impropriety.  He argues that the existing test fails to provide "objective guidance" and notice to judges.  He also claims it presents a risk that discipline will be based on unreasonable inferences drawn by unreasonable people.  In place of the current standard, Judge Keegan maintains that a "reasonable person" test, like the one in DeNike v. Cupo, 196 N.J. 502, 517 (2008), should apply.  Judge Keegan also submits that he did not violate the Code of Judicial Conduct and that no discipline should be imposed.

The designated Presenter supports the ACJC's finding that Judge Reddin and Judge Keegan violated the applicable canons of the Code of Judicial Conduct.  The Presenter contends that the Judges' behavior -- dining publicly with an individual after his widely publicized arrest and indictment -- created an inappropriate public impression that undermined confidence in the Judiciary and demeaned the judicial office.

The Presenter relies on the current standard to evaluate an appearance of impropriety and argues that Respondents had "a duty to foresee" that their conduct might lead to public criticism.  (Quoting Blackman, supra, 124 N.J. at 553).

8

III.

A.

We begin with certain familiar concepts from the Code of Judicial Conduct. Canon 1 highlights the "bedrock principle" that "a judge should uphold the integrity and independence of the Judiciary." DeNike, supra, 196 N.J. at 514; Code of Judicial Conduct, Canon 1. To achieve that aim, the Canon requires judges to maintain, enforce, and "personally observe high standards of conduct." Code of Judicial Conduct, Canon 1.

Canon 2 directs judges to "avoid impropriety and the appearance of impropriety in all activities." The Canon adds that judges "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Code of Judicial Conduct, Canon 2A.

That obligation extends to judges' private lives. As the commentary to Canon 2 notes, judges "must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen." Code of Judicial Conduct, Canon 2 cmt. In short, because judges are in the public eye, "everything [they] do can reflect on their judicial office" and

9

has the potential to erode public confidence. Blackman, supra, 124 N.J. at 551.

Canon 5 instructs judges to conduct their extra-judicial activities in a way that "minimize[s] the risk of conflict with judicial obligations" and does not "demean the judicial office." Code of Judicial Conduct, Canons 5, 5A(2). At the same time, the commentary recognizes that a "[c]omplete separation of a judge from extra-judicial activities is neither possible nor wise; a judge should not become isolated from the community in which the judge lives." Id., Canon 5A cmt.

B.

The ACJC followed relevant case law from this Court to measure Respondents' behavior: The Committee considered whether the Judges' conduct "engenders 'a fair possibility that some portion of the public might become concerned' about the judge's integrity and impartiality." (Quoting Blackman, supra, 124 N.J. at 552 (internal citation omitted)).

That principle was first articulated by Chief Justice Wilentz when the Court publicly reprimanded two judges who attended a governor's inaugural ball. Chief Justice Wilentz, Statement by Court on Reprimands, 125 N.J.L.J. 243 (Feb. 1, 1990) (Wilentz). The event was expected to generate substantial net proceeds that would benefit a state political party. Ibid. As the Chief Justice explained, when it comes to judicial

conduct, "appearances count as much as the facts" and judges "must make many sacrifices, sometimes most substantial, in order to maintain the public's confidence in the judiciary." Ibid. Under the circumstances, the Court concluded, the judges "knew or should have known that this was a political function or that it would appear to the public to be such," and that "their attendance had the strong potential of creating an appearance of judges' involvement in politics." Ibid.

Under the standard the Court announced, "[i]t does not matter" whether an individual's "interpretation" of a judge's conduct "was reasonable or whether it might have been at odds with [a judge's] true motives." Blackman, supra, 124 N.J. at 552-53; see also Wilentz, supra, 125 N.J.L.J. 243 ("The issue is not whether a reasonable person would probably conclude the judge had become vulnerable to political influence."). The Court focused, instead, on "whether there is a fair possibility that some portion of the public might become concerned" by the judges' conduct. Wilentz, supra, 125 N.J.L.J. 243.

The Court applied the same standard in Blackman to a judge who attended a widely publicized picnic with about 150 to 200 guests. Blackman, supra, 124 N.J. at 550. The party was hosted by a close friend of the judge who had recently been convicted of federal racketeering charges and was scheduled to report to prison in a matter of days. Id. at 549-50. The Court accepted

the judge's explanation that he had no improper motive.  Id. at 552.  The thrust of the decision addressed his conduct and the appearance it created:

> When a judge chooses to attend a party hosted by a convicted criminal, . . . [s]uch conduct could be perceived as evidencing sympathy for the convicted individual or disagreement with the criminal justice system that brought about the conviction.  At worst, such conduct may raise questions concerning the judge's allegiance to the judicial system.  Those impressions could generate legitimate concern about the judge's attitude toward judicial responsibilities, weakening confidence in the judge and the judiciary.
>
> [Id. at 551.]

Whether or not the public's interpretation was reasonable, or misinterpreted the judge's motives, the Court opined that the judge had "a duty to foresee that his actions might be open to criticism by the press or members of the public."  Id. at 552-53.  Because the Court found that the judge "conveyed the wrong image of the judiciary," the Court publicly reprimanded him. Id. at 553.

The parties also cite In re Rodriguez, 196 N.J. 450 (2008), in which the Court publicly admonished a municipal court judge for appearing at a mayor's house on the day that authorities had arrested the mayor for taking a bribe.  See In re Rodriguez, ACJC No. 2008-001 (July 30, 2008) (slip op. at 2), available at http://www.judiciary.state.nj.us/pressrel/

12

Rodriguez_Presentment.pdf.  A local newspaper published an article along with a photograph of the judge and two political figures standing outside the home.  Id. at 2, 4.

The ACJC relied heavily on Blackman and recommended that the judge be publicly admonished.  Id. at 6-8.  The respondent accepted the recommendation and waived his right to appear before the Court.  As a result, the Court simply adopted the agreed-upon recommendation and entered an order.  Rodriguez, supra, 196 N.J. at 450.  The Court did not issue an opinion.

C.

Other jurisdictions apply a different test to determine when a judge's conduct creates an appearance of impropriety.  A majority of states, the District of Columbia, and the federal courts all consider whether reasonable minds would perceive that a judge has violated the judicial canons of ethics.

Canon 2 of New Jersey's Code of Judicial Conduct tracks the language from the 1972 version of the American Bar Association's (ABA) Model Code of Judicial Conduct.  The 1972 model rule did not propose a standard to assess the appearance of impropriety.  See ABA Model Code of Judicial Conduct, Canon 2 cmt. (1972).

In 1990, the ABA revised the model code and updated Canon 2.  The commentary to the new version included an objective standard:  "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that

13

the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." ABA Model Code of Judicial Conduct, Canon 2A cmt (1990) (emphasis added). New Jersey did not adopt this change.[1]

The following decade, the ABA again reviewed the model code and made additional revisions. In 2007, it restructured and slightly modified Canon 2, which now appears as Model Rule 1.2 -- titled "Promoting Confidence in the Judiciary." The model rule, which remains in place today, states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." ABA Model Code of Judicial Conduct, R. 1.2 (2014). Commentary to the rule contains the following standard, which differs only modestly from the 1990 comment: "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." ABA Model Code of Judicial Conduct, R. 1.2 cmt. 5 (2007).

---

[1] In December 2014, a committee that reviewed our existing Code of Judicial Conduct and considered the current ABA model rules referred its final recommendations to the Court.

A majority of states -- thirty-nine in all -- and the District of Columbia have adopted the language and relevant commentary of the 1990 or 2007 ABA model rule, or rely on a similar objective standard. See Alaska Code of Judicial Conduct, Canon 2A cmt. (2014); Ariz. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Ark. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Cal. Code of Judicial Ethics, Canon 2A cmt. (2014); Colo. Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); Conn. Code of Judicial Conduct, Canon 1, R. 1.2 (2014); D.C. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Del. Code of Judicial Conduct, R. 1.2(A) (2014); Fla. Code of Judicial Conduct, Canon 2A cmt. (2014); Ga. Code of Judicial Conduct, Canon 2A cmt. (2014); Idaho Code of Judicial Conduct, Canon 2A cmt. (2013); Ind. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Iowa Code of Judicial Conduct, R. 51:1.2 cmt. 5 (2014); Kan. Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); Ky. Code of Judicial Conduct, Canon 2A cmt. (2014); Md. Code of Judicial Conduct, Md. R. 16-813, R. 1.2(b), (b)(5) (2014); Mass. Code of Judicial Conduct, Mass. Sup. Jud. Ct. R. 3:09, Canon 2A cmt. (2014); Minn. Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); Miss. Code of Judicial Conduct, Canon 2A cmt. (2014); Mo. Code of Judicial Conduct, Canon 1, R. 2-1.2 cmt. 5 (2014); Mont. Code of Judicial Conduct, R. 1.2 cmt. 5 (2012); Neb. Code of Judicial Conduct, § 5-301.2 cmt. 5 (2014); Nev.

15

Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); N.H. Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); N.M. Code of Judicial Conduct, § 21-102 cmt. 5 (2014); N.D. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Ohio Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); Okla. Code of Judicial Conduct, Canon 1, R. 1.2 cmt. 5 (2014); Pa. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); R.I. Code of Judicial Conduct, Art. VI, Canon 2A cmt. (2014); S.C. Code of Judicial Conduct, Canon 2A, R. 501 cmt. (2013); S.D. Code of Judicial Conduct, Canon 2A cmt. (2014); Tenn. Code of Judicial Conduct, Tenn. Sup. Ct. R. 10, Canon 1, R. 1.2 cmt. 5 (2014); Utah Code of Judicial Conduct, R. 1.2 cmt. 5 (2014); Canons of Judicial Conduct for the State of Va., Canon 2A, Va. Sup. Ct. R. pt. 6, sec. III cmt. (2014); Wash. Code of Judicial Conduct, Canon 1.2 cmt. 5 (2014); W. Va. Code of Judicial Conduct, Canon 2A cmt. (2014); Wis. Code of Judicial Conduct, Wis. Sup. Ct. R. 60.03 cmt. (2014); Wyo. Code of Judicial Conduct, R. 1.2 cmt. 5 (2014).[2]  The Supreme

---

[2]  Eight other states also direct judges to act in a way that avoids all appearances of impropriety, but the states' respective codes of judicial conduct and their commentaries do not specify what standard applies.  See Ala. Canons of Judicial Ethics, Canon 2A (2014); Haw. Code of Judicial Conduct, Canon 1, R. 1.2 (2014); Ill. Code of Judicial Conduct, Canon 2, R. 62 (2014); Me. Code of Judicial Conduct, Canon 2 (2014); Mich. Code of Judicial Conduct, Canon 2 (2014); N.Y. Code of Judicial Conduct, Canon 2 [100.2] (2014); Tex. Code of Judicial Conduct, Canon 2 (2014); Vt. Code of Judicial Conduct, Canon 2 (2014).  A number of those states, like New Jersey, appear to follow the

Court of Louisiana, through its case law, has also adopted an objective test to measure whether a judge's actions create an appearance of impropriety. See In re Chaisson, 549 So. 2d 259, 263 (La. 1989).

Federal courts similarly use an objective standard. The text of Canon 2 of the Code of Conduct for United States Judges is nearly identical to the language in Canon 2 of New Jersey's Code of Judicial Conduct. A comment to the federal rule, though, differs from New Jersey's longstanding approach. See Code of Conduct for United States Judges, Canon 2A cmt. (2014). The comment states that "[a]n appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired." Ibid.

Recent case law in our State on the subject of recusal has also invoked a more objective measure to evaluate possible conflicts of interest. In DeNike, supra, the Court considered

---

1972 version of the ABA model rule, which lacked a standard. ABA Model Code of Judicial Conduct, Canon 2 (1972).

Oregon requires judges to avoid conduct that "reflects adversely on the judge's character, competence, temperament, or fitness," but no standard appears in the state's code. Or. Code of Judicial Conduct, R. 2.1(C) (2014). North Carolina's code does not have an appearance of impropriety standard. N.C. Code of Judicial Conduct, Canon 2 (2014).

whether it was appropriate for a sitting trial judge to engage in preliminary discussions about employment opportunities at a lawyer's firm, while the lawyer was presenting a matter to the judge which was not yet fully resolved. 196 N.J. at 506. To evaluate whether the judge should have disqualified himself, the Court asked, "Would a reasonable, fully informed person have doubts about the judge's impartiality?" Id. at 517; see also State v. McCabe, 201 N.J. 34, 44 (2010) (applying DeNike standard to municipal court judges).

The DeNike standard is not a perfect fit to assess a jurist's personal conduct off the bench for a simple reason: it is impractical to expect that members of the public who briefly observe a judge's behavior in public could be fully informed about the underlying facts. Unlike a party to a lawsuit, an observer in a restaurant would not have the benefit of being familiar with the record. Instead, a passerby who sees a judge dine in public with a defendant who is awaiting trial would likely form an opinion with little or no additional information to provide context.

A standard that does not consider notions of "reasonableness," though, can invite different problems. To be sure, ethical principles that are meant to guide judges cannot depend on unreasonable judgments reached by a few, even if such inferences are possible. And discipline should not be imposed

18

on the basis of questionable deductions that one or more members of the public draw.  In any event, appropriate measures of conduct should provide clear guidance in advance.

D.

To address those concerns, as well as the weight of authority from other jurisdictions, we modify the <u>Blackman</u> standard and add an element of objective reasonableness to it. To assess whether a judge's personal behavior creates an appearance of impropriety, we hold that the following standard should apply:  "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?"

That approach appropriately protects the reputation of the Judiciary and, by extension, the public.  It still requires that judges tailor their personal behavior to avoid the appearance of impropriety.  And when there is a <u>reasonable</u> basis to doubt a judge's behavior, the questioned conduct would be forbidden and could subject the jurist to discipline.

An objective standard is also fairer to judges.  They can better anticipate the meaning of the more familiar test.  As a result, judges will be in a better position to conform their personal conduct to that measure.

In addition, a standard that focuses on reasonable concerns will help prevent frivolous complaints against judges and

19

protect the integrity of the disciplinary process.  In the end, an objective test will both benefit the public, whom judges "serve in administering our system of justice," In re Advisory Letter No. 7-11, 213 N.J. 63, 78 (2013), and sustain confidence in the Judiciary.

IV.

We next consider the Judges' behavior in this case with the above standard in mind.  Both Judges have longstanding friendships with Ardis.  Judge Reddin's close relationship dates back more than fifty years; Judge Keegan's friendship began nearly three decades ago.  The dinner that all three attended at a local restaurant was part of a weekly gathering with other friends -- part of a tradition that had been ongoing for more than a decade.  After dinner, the Judges and others attended Mass together, as they regularly did.  There is no suggestion in the record that either Judge discussed Ardis's criminal case that evening or had any involvement with it at any time.  Nor is there any suggestion that the Judges had any improper motive.

We note, as well, that both Judges have no prior record of discipline.  To the contrary, their fine reputations as public servants are untarnished.  We also commend their immediate response to the investigation:  They stopped attending the Thursday night gatherings as soon as they learned that a

20

grievance had been filed. They also fully cooperated in a forthright manner throughout the investigation.

The gathering, nonetheless, raises some very serious concerns. Respondents spent an extended period of time socializing in public with a defendant who faced trial on serious criminal charges. As the ACJC noted, members of the public "might conclude that Respondents tacitly endorsed Mr. Ardis's innocence, disagreed with the criminal justice system that indicted him, or worse, assisted Mr. Ardis with his criminal court matter." In addition, one of the Respondents serves and decides disputes in the courthouse where Mr. Ardis's charges were to be resolved. That connection to the court system only fuels a perception of improper conduct.

This case is quite different from Opinion 26-01, on which Judge Reddin relies. See Annotated Guidelines for Extrajudicial Activities, Nov. 2007, Opinion 26-01. In that matter, a judge sought and obtained advance approval from the Advisory Committee on Extrajudicial Activities to attend a retirement dinner of a Senator who was a longstanding friend and former law partner of the judge. The case bears no relationship to the facts here. A retirement dinner for a friend and former partner who is not the subject of criminal proceedings is a far cry from weekly, public dinners with a friend under indictment. Also, as the ACJC

noted, Ardis's "indictment relates directly to the work of the Judiciary of which Respondents are both members."

In this case, we find that Respondents' personal behavior could cause a reasonable observer to question the Judges' impartiality. By socializing in public with a defendant who awaited a criminal trial, Respondents created a reasonable prospect that a member of the public would call into question their view of the charges and the criminal process underway. The situation was aggravated by the fact that one of the Respondents served in the very courthouse where the criminal case was to be resolved. We therefore find by clear and convincing evidence that Canons 1, 2A, and 5A(2) were violated. See R. 2:15-15(a); In re Seaman, 133 N.J. 67, 74 (1993).

Because we now modify the standard to evaluate a judge's personal behavior under the Code of Judicial Conduct, we decline to impose any sanctions in this case. However, in an effort to offer guidance for the future, we stress that the circumstances presented would result in the imposition of discipline, going forward, under the new standard.

This matter did not arise out of a random encounter in a public place that led to a brief, courteous exchange. Such inadvertent contacts may, of course, take place in everyday life and would not create reasonable cause for concern. The case, instead, involved a lengthier dinner in public, planned in

advance, with a defendant under indictment.  Because such events raise questions about the integrity of judges and the Judiciary as a whole, they should not take place.  As the Court observed more than a half century ago, "judges must refrain from engaging in any conduct which may be hurtful to the judicial system," State v. Deutsch, 34 N.J. 190, 206 (1961), because "'justice must satisfy the appearance of justice,'" ibid. (quoting Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13, 99 L. Ed. 11, 16 (1954)).

We do not pass judgment on Ardis's character in this decision or on Respondents' continued friendship with him.  Although judges must accept limits on their personal behavior, they are not required to shun dear, lifelong friends or family members who face criminal charges.  But planned social interactions like the one in question here are best held in private without a group of onlookers.  We appeal to judges' good common sense and encourage them not to socialize in public in such instances and thereby highlight for others a longstanding relationship that may raise reasonable concerns.  In that way, judges can avoid conduct that may convey the wrong image of the Judiciary and invite criticism.  To err on the side of caution, judges may also seek advance guidance from the Advisory Committee for Extrajudicial Activities if they have questions.

V.

We therefore agree with the ACJC's conclusion that Canons 1, 2A, and 5A(2) were violated but impose no sanction on Respondents.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON, and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.

SUPREME COURT OF NEW JERSEY

D-123-13

NO. _D-124-13_                                    SEPTEMBER TERM 2013

APPLICATION FOR _____

DISPOSITION ____Order to Show Cause Why Respondents Should_____

____Not be Publicly Disciplined_____



IN THE MATTER OF

RAYMOND A. REDDIN,

A Judge of the Superior Court

_____

IN THE MATTER OF

GERALD KEEGAN,

A Judge of the Municipal Court



DECIDED        January 21, 2015

OPINION BY          Chief Justice Rabner

CONCURRING OPINION BY

DISSENTING OPINION BY

| CHECKLIST | NO SANCTION | | |
|-----------|-------------|---|---|
| CHIEF JUSTICE RABNER | X | | |
| JUSTICE LaVECCHIA | X | | |
| JUSTICE ALBIN | X | | |
| JUSTICE PATTERSON | X | | |
| JUSTICE FERNANDEZ-VINA | X | | |
| JUSTICE SOLOMON | X | | |
| JUDGE CUFF (t/a) | X | | |
| TOTALS | 7 | | |

1