**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4765-15T2[1]
              A-0422-16T2
              A-0531-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMELL D. SCOTT, a/k/a
JAMAL SCOTT,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LEE C. REEVES, a/k/a KAOZ,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

---

[1] These are back-to-back post-conviction relief (PCR) petitions consolidated for the purpose of this opinion.

Plaintiff-Respondent,

v.

TYLEEK J. BAKER,

Defendant-Appellant.

_____

Submitted October 30, 2018 – Decided August 14, 2019

Before Judges Suter and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Ocean and Monmouth Counties, Indictment Nos. 06-05-0869 and 09-01-0109.

Joseph E. Krakora, Public Defender, attorney for appellants (John A. Albright, Designated Counsel, on the brief in A-4765-15; Monique Moyse, Designated Counsel, on the brief in A-0422-16; Alison S. Perrone, Designated Counsel, on the brief in A-0531-16).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Shiraz I. Deen, Assistant Prosecutor, on the brief).

Appellants Jamell D. Scott and Tyleek J. Baker filed pro se supplemental briefs.

PER CURIAM

In these back-to-back PCR petitions, which we consolidate for purposes

of this opinion, defendants Tyleek J. Baker, Jamell D. Scott and Lee C. Reeves

2

appeal the denial of their PCR petitions without an evidentiary hearing. For reasons that follow, we affirm the denial of each petition.

I

The PCR petitions arise from the murders of Jose Francisco Olivares and Thelma Vazquez in separate but related incidents. In Indictment 06-05-0869, the State contended that Tyleek Baker shot and killed Olivares in a barbershop in Lakewood over a dispute. Jamell Scott and James Russell[2] were charged as accomplices in that murder. In Indictment 09-01-0109, the State contended that Lee Reeves—intending to kill Christian Vivar Granados, who was to testify at trial the next day against Baker, Scott and Russell—shot and killed Vasquez, who was the mother of Granados' girlfriend. Scott was charged as an accomplice in that murder as well.

The indictments were tried in separate jury trials. Baker and Scott were defendants in the trial of 06-05-0869. Reeves and Scott were defendants in the trial of 09-01-0109.

---

[2] We affirmed the denial of Russell's PCR petition in a separate unpublished opinion, State v. Russell, No. A-5319-15 (App. Div. May 15, 2019) (slip op. at 2, 34).

Indictment 06-05-0869

Relevant to these appeals, the evidence at the trial involving Baker and

Scott revealed:

> [A]t approximately 4:00 p.m. on February 7, 2006, Jason Vega arrived at the Man, Woman and Child Barbershop in Lakewood. Vega's brother, Ramon, and Vega's friends, Christian Vivar Granados and Olivares, known as "Hefe," were already there. Jose Silva was one of the barbers at the shop that day.
>
> Vega . . . walked through another room where approximately nine people were gathered, stopping briefly to say hello. Baker, who was known as "Respect," was playing chess with another person when he began "mocking" Vega. Vega ignored Baker's "mocking" until he heard Baker say to someone on the phone, "Jason Vega and his boys are plotting on me." Not knowing to whom Baker was speaking, Vega was upset and thought he was going to "have to . . . watch[] [his] back." Vega challenged Baker to a fight "and he accepted." Vega "asked him to step outside . . . to settle it[,] basically, fistfight." James Bellamy . . . claimed, however, that Baker was not involved in any arguments or confrontations.
>
> According to Vega, after Baker accepted the challenge, Baker asked someone if Hefe was in the shop. When told he was, Baker ran out the back door. Vega waited for Baker in front of the barbershop for approximately fifteen minutes and then left.
>
> Shortly after this confrontation, Granados saw Russell, whom he knew as "Gotti," and Scott, who was known as "High-Five," enter the barber shop and walk to the

4

back. They stayed in the store for a couple of minutes before leaving.

Silva was arranging his barber station when he saw Baker, who he knew as a regular customer, come in with two other men. When the men entered, Olivares was seated, but, as he stood up from his chair, Baker shot him six times . . . . Silva could not identify the two men with Baker.

Granados was getting his hair cut when he saw Baker, Russell, and Scott walk into the shop. He heard Baker say, "Where's that nigger that have a beef with me?" Olivares stood up, said, "What's up?," and Baker shot him. Granados explained that during the shooting, Russell stood on Baker's left and Scott on his right. Both men had their hands crossed in front of them, kept a straight face, and did not appear upset or surprised.

[State v. Scott (Scott I), Nos. A-3455-08, A-4794-08, A-4841-08 (App. Div. Apr. 20, 2012) (slip op. at 9-11).]

The three men left the barbershop and fled. Eventually, Baker and Scott were arrested in Las Vegas.

Baker and Scott were charged with first-degree murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:2-6, and first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3 and 2C:5-2. Additional charges against Baker included: second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree certain persons not to have a firearm, N.J.S.A. 2C:39-7(b)(1). The case

was tried in 2008. Baker and Scott were convicted of the murder charges. Baker pleaded guilty to the certain persons offense after he was convicted on the other counts. Defendants' motions for a new trial and for judgment of acquittal were denied by the trial court.

Baker was sentenced to a life term of imprisonment with an eighty-five percent period of parole ineligibility on the murder counts, which were merged, and to a ten-year consecutive term on the certain persons offense with five years of parole ineligibility. Scott was sentenced to a life term with an eighty-five percent period of parole ineligibility on the murder charge. We affirmed their convictions and Scott's sentence. Scott I, slip op. at 7-8, 47. We also affirmed Baker's sentence except for the consecutive portion on the firearms charge, which we remanded solely for reconsideration of the consecutive term.[3] Id. at 7-8, 49. The Supreme Court denied their petitions for certification. 212 N.J. 431 (2012).

Indictment 09-01-0109

Regarding indictment 09-01-0109, the evidence at trial involving Reeves and Scott revealed:

---

[3] Baker was resentenced. The ten-year sentence was reduced to seven with a five-year period of parole ineligibility that was concurrent to his life term.

In February 2006, Christian Vivar Granados was an eyewitness to a violent incident that led to criminal charges against Scott, Russell, and Tyleek Baker relating to the murder of Jose Francisco Olivares in a Lakewood barbershop. During his 9-1-1 call, Granados identified one of the participants by nickname and first name. He also gave statements to the police and identified all three participants in photographs.

Granados's name and address appeared in the police reports and other documents produced during discovery in the Olivares murder proceeding. At a plea cut-off hearing in August 2008, Scott and Russell acknowledged that they had reviewed the discovery materials with their attorneys. The court set the trial date for September 15, 2008.

Jury selection began on September 17, 2008. On October 7, 2008, the trial judge advised the defendants that opening statements and witness testimony would begin on October 14, 2008.

. . . .

On Tuesday, October 14, 2008, Granados was staying with his girlfriend, Alisa Morales, and her mother, Thelma Vazquez, at the Congress Apartments in Lakewood. Prior to that day, a defense investigator had visited a different address listed for Granados in the Olivares discovery materials and was directed by Granados's mother to reach Granados at the Congress Apartments.

. . . .

Shortly before 6:00 a.m., Vazquez was sleeping on the sofa in the living room when the household's dog began barking. Morales and Granados, who were in the bedroom, heard Vazquez call for the dog and ask, "Que

7

lo que?" Then they heard gunshots. Upon entering the living room, they saw the front door open and Vazquez bleeding on the sofa. While Granados called 9-1-1, Morales ran outside in an effort to get a glimpse of the shooter, but she did not see anyone.

[State v. Scott, Reeves, Russell, and Trishawn F. Cochran (Scott II), Nos. A-2580-09, A-4100-09, A-4101-09, A-6279-09 (App. Div. Apr. 16, 2013) (slip op. at 4-8) (footnote omitted).]

Vasquez died shortly after. The handgun and two shell casings were obtained through investigation and forensically linked. An investigation connected Reeves to the shooting and a scheme involving Scott and Russell to kill Granados.

Reeves and Scott[4] were charged with first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) or (b) and N.J.S.A. 2C:5-2; first-degree murder, N.J.S.A. 2C:11-3(a) or (b); two counts of first-degree attempted murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-1; second-degree burglary, N.J.S.A. 2C:18-2; second-degree conspiracy to commit witness tampering, N.J.S.A. 2C:28-5(a) and N.J.S.A. 2C:5-2; and first-degree witness tampering, N.J.S.A. 2C:28-5(a) and N.J.S.A. 2C:5-2. Reeves also was charged with second-degree

---

[4] Cochran, Joseph Powell and Russell were included under the same indictment. Powell pleaded guilty to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).

possession of a weapon for unlawful purposes, in violation of N.J.S.A. 2C:39-4(a).

Reeves and Scott were tried jointly in 2009 before a jury.[5] The same trial judge was assigned, who had tried the 2006 indictment involving Baker and Scott. Reeves testified that he shot Vasquez. Scott did not testify. Powell testified that Reeves and the other co-defendants were members of the Bloods gang and that Reeves had been ordered to kill Granados, the witness in the barber shop murder. Other witnesses provided testimony that corroborated Reeves' and Scott's involvement.

Reeves and Scott were convicted of all the charges against them. Reeves was sentenced to an aggregate term of life in prison subject to an eighty-five percent period of parole ineligibility. Scott was sentenced to an aggregate life term with an eighty-five percent period of parole ineligibility to be served consecutively to the sentence he was serving.

We affirmed their convictions and sentences. Scott II, slip op. at 119. The Supreme Court denied their petitions for certification. 216 N.J. 14 (2013).

_____

[5] We limit our discussion to the issues raised by defendants in these appeals.

<u>PCR Petitions</u>

In his direct appeal, Baker alleged the trial judge prosecuted him in a number of cases when the judge was an assistant prosecutor and he was a juvenile. He claimed he told his trial counsel, who told him he had spoken with the trial judge and said that the trial "judge would be fair." <u>Scott I</u>, slip op. at 47-48. In our 2012 opinion, we observed that this conflict issue was more appropriately addressed in a PCR petition because, at that time, there was "no specific information about the juvenile charges and when they were allegedly prosecuted." <u>Id.</u> at 49.

Baker, Scott, Reeves and Russell filed separate petitions for PCR. The cases were transferred to the Monmouth vicinage where the PCR court heard all of the PCR petitions together. The PCR judge ordered the in-camera production of fourteen internal files from the prosecutor's office about Baker's charges as a juvenile. Review showed a number of documents between 1993 and 1998 where the trial judge had some level of involvement.[6] Some of the documents indicated a supervisory capacity. There also were four juvenile delinquency complaints against Baker that the trial judge signed in his former capacity as an assistant prosecutor.

---

[6] <u>See</u> Schedule A to this opinion.

A-4765-15T2

The PCR court allowed written interrogatories to be posed to the trial judge for his response, but the parties could not contact the trial judge directly. Defendants filed motions to recuse the PCR judge based on the procedures she had set up. Scott's counsel objected to the inability to personally question the trial judge and because some of his questions were not submitted to the judge. The PCR court denied these motions.

In his answers to the interrogatories, the trial judge certified he was an assistant prosecutor from 1988 to 1999, serving as a trial attorney through August 1993 and a supervisor from then until 1999. As a supervising prosecutor, he conferenced over 500 cases and tried over twenty juvenile cases per year. In his answers, he denied that Baker's counsel told him about any potential conflict when he handled the trial of indictment 06-05-0869, and he had no recollection of previously prosecuting Baker. Had he remembered, or received any evidence about prosecuting Baker, he "would have transferred the case to another judge."

Just prior to jury selection for indictment 09-01-0109, the trial judge advised the parties that he had been informed that Reeves had participated in the mentoring program known as Omega XIII. The judge was involved with the program but did not recall Reeves' being a participant. In his answers to the

11

interrogatories, the trial judge stated he did not recall personally counseling Reeves or having any involvement with him in the program.

The PCR court heard oral argument on all of the PCR petitions and in a comprehensive, well-reasoned opinion, denied the petitions on April 29, 2016, without the evidentiary hearing defendants requested.

Baker's PCR petition alleged that his trial counsel "rendered assistance that was constitutionally ineffective." Relevant here, he claimed his attorney was ineffective by allowing the trial judge to preside over a case where the judge previously had prosecuted him when he was as a member of the prosecutor's office.

The PCR court rejected Baker's claim that he was entitled to relief based on his allegation the trial judge prosecuted him as a juvenile offender. Baker could have raised this conflict issue at any point prior to, during or after trial. He did not raise it until 2010, two years after the trial. More importantly, Baker did not allege any actual bias by the trial judge. Because Baker was not alleging the judge acted with bias or partiality, Baker could not show that the result of the proceeding would be different if the trial court were disqualified retroactively. The PCR court found no corroborating evidence that Baker's trial counsel informed the trial court about the conflict prior to trial. The trial court

denied any such notice. The PCR court applied the factors in State v. Presley[7] to determine there was no basis for PCR relief.

Reeves argued the trial judge should have been disqualified because he was involved in the Omega XIII youth mentoring program when Reeves was participating. He claimed the judge removed him from the program because he was a bad influence. Reeves asserted he was deprived of a fair trial because the judge prosecuted co-defendant Baker when Baker was a juvenile. He argued his counsel provided ineffective assistance because at a pre-trial conference, he directed Reeves to confess to shooting Vasquez. His counsel also should have asked for a mistrial because of juror misconduct. Reeves complained that the State committed a Brady[8] violation by not disclosing a letter written to another judge by co-defendant Powell and an affidavit by Devon Hardy, who allegedly was a cellmate of Powell's.

The PCR court found there was no "constitutional defect" because "there [was] no substantiated allegation that [the trial judge] was in any way partial or biased." Reeves admitted shooting Vasquez and there were corroborating

---

[7] 436 N.J. Super. 440 (App. Div. 2014).

[8] Brady v. Maryland, 373 U.S. 83 (1963).

witnesses. There was no reason to disqualify the judge retroactively based on analysis of the Presley factors.

The PCR court also rejected Reeves' ineffective assistance claims. No one told Reeves his pre-trial admissions would be admissible against him at trial. He could have changed his mind and decided not to testify. Reeves did not show the outcome of the trial would have been different had he not acknowledged the shooting or if his attorney asked for the trial judge's recusal. He did not show the Powell letter or Hardy affidavit were ever in the State's possession or that they were material to his case. All of the jurors told the trial judge on voir dire examination that they could decide the case based on the evidence even though one juror looked up information on the internet.

Scott's PCR petition under indictment 06-05-0869 asserted he should have been able to interview the trial judge about Baker's juvenile cases, that the trial judge should have been disqualified, and that his trial and appellate counsel rendered ineffective assistance. He claimed cumulative errors deprived him of a fair trial. He asserted issues about courthouse security protocols, prosecutorial misconduct and erroneous jury charges. Under indictment 09-01-0109, Scott again raised conflict issues involving the trial court, and claims about

prosecutorial misconduct, cumulative errors and the failure by his counsel to request a mistrial for juror misconduct. He requested an evidentiary hearing.

The PCR court found that Scott lacked standing to raise the disqualification issue. Citing Presley, even if Baker and Reeves could assert that the judge should have been disqualified based on a conflict, this was an "insufficient basis" for Scott to obtain a new trial. The PCR court rejected Scott's other arguments for PCR relief and for an evidentiary hearing.

Baker, Reeves and Scott appeal the denial of their PCR petitions and requests for an evidentiary hearing. On appeal, they raise the following issues:

Baker:

> POINT ONE
>
> THE PCR COURT'S DECISION DENYING DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF MUST BE REVERSED BECAUSE THE JUDGE PRESIDING OVER DEFENDANT'S TRIAL HAD PREVIOUSLY PROSECUTED DEFENDANT. AT THE VERY LEAST, DEFENDANT SHOULD HAVE BEEN GRANTED AN EVIDENTIARY HEARING ON THIS ISSUE.

Baker filed a pro se supplemental brief on appeal where he raised this issue:

> THE PCR COURT'S DECISION DENYING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF MUST BE REVERSED

BECAUSE THE PCR COURT APPLIED THE WRONG LEGAL STANDARD.

Reeves:

POINT ONE

MR. REEVES IS ENTITLED TO A HEARING ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

POINT TWO

JUDGE DANIELS' FAILURE TO DISQUALIFY HIMSELF FROM MR. REEVES' CASE AND/OR FROM TYLEEK BAKER'S CASE DEPRIVED MR. REEVES OF A FAIR TRIAL, AND HIS CONVICTIONS MUST BE REVERSED.

POINT THREE

THE STATE VIOLATED BRADY V. MARYLAND, 373 U.S. 83 (1963) BY FAILING TO DISCLOSE POWELL'S LETTER AND DEVON HARDY'S AFFIDAVIT.

Scott:

POINT I

THE DENIAL OF POST-CONVICTION RELIEF MUST BE REVERSED BECAUSE THE TRIAL JUDGE HAD PREVIOUSLY PROSECUTED CO-DEFENDANT BAKER AND ACKNOWLEDGED A PERSONAL RELATIONSHIP WITH CO-DEFENDANT REEVES. IT WAS OF NO MOMENT THAT THE EARLIER PROSECUTIONS AND RELATIONSHIP WERE NOT WITH DEFENDANT

16

DIRECTLY BECAUSE THE DEFENDANTS WERE TRIED JOINTLY IN A SHROUD OF IMPROPRIETY.

POINT II

THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF WITHOUT CONDUCTING AN EVIDENTIARY HEARING ON THE CONFLICT BETWEEN THE TRIAL JUDGE AND DEFENDANTS AND ON DEFENDANT'S OTHER CLAIMS.

POINT III

THE PCR COURT DENIED DEFENDANT THE EFFECTIVE ASSISTANCE OF PCR COUNSEL WHEN IT BARRED ANY INVESTIGATION INTO THE CONFLICT BETWEEN THE TRIAL JUDGE AND DEFENDANTS BEYOND SEVERELY LIMITED AND CENSORED INTERROGATORIES TO THE TRIAL JUDGE.

POINT IV

RECUSAL WAS REQUIRED WHEN THE PCR JUDGE SOUGHT TO DISMISS DEFENDANT'S AND CO-DEFENDANT RUSSELL'S POST-CONVICTION RELIEF PETITIONS AT THE OUTSET OF THE PROCEEDINGS WITH THE AID OF THE PROSECUTOR, AND TO INSULATE THE TRIAL JUDGE FROM ANY INQUIRY OR INVESTIGATION THAT MIGHT MAKE HIM "UNCOMFORTABLE."

II

The standard for determining whether counsel's performance was ineffective for purposes of the Sixth Amendment was formulated in Strickland v. Washington, 466 U.S. 668 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987).  In order to prevail on an ineffective assistance of counsel claim, defendants must meet a two-prong test by establishing that: (l) counsel's performance was deficient and the errors made were so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to the United States Constitution; and (2) the defect in performance prejudiced defendants' rights to a fair trial such that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

"[A] prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction review." State v. Preciose, 129 N.J. 451, 476 (1992) (citing R. 3:22-5).  Additionally, a defendant is precluded from raising an issue on PCR that could have been raised on direct appeal.  State v. McQuaid, 147 N.J. 464, 483 (1997); R. 3:22-4.  As explained by the Court in McQuaid:

> A defendant ordinarily must pursue relief by direct appeal, see R. 3:22-3, and may not use post-conviction

> relief to assert a new claim that could have been raised on direct appeal. See R. 3:22-4. Additionally, a defendant may not use a petition for post-conviction relief as an opportunity to relitigate a claim already decided on the merits. See R. 3:22-5.
>
> [McQuaid, 147 N.J. at 483.]

The application of these standards requires the "[p]reclusion of consideration of an argument presented in post-conviction relief proceedings . . . if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal." State v. Marshall (Marshall IV), 173 N.J. 343, 351 (2002) (quoting State v. Marshall (Marshall III), 148 N.J. 89, 150 (1997)). A PCR claim is based upon the "same ground" as a claim already raised by direct appeal when "'the issue is identical or substantially equivalent' to [the] issue previously adjudicated on its merits." McQuaid, 147 N.J. at 484 (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971); State v. Bontempo, 170 N.J. Super. 220, 234 (Law Div. 1979)).

## A

Baker contends he is entitled to post-conviction relief because the trial judge had a disqualifying conflict based on his alleged prosecution of Baker as a juvenile. He is not claiming there was any actual bias. He argues this relief is warranted regardless of whether the judge actually prosecuted Baker or

whether he recollected prosecuting Baker. He argues the trial court had to be disqualified once the conflict was raised, even if raised after the verdict. In his pro se brief, Baker contends the PCR court applied the wrong legal standard—that the test is not whether the trial judge was actually biased but whether there was the potential for bias. He argues the PCR court should have ordered an evidentiary hearing instead of limiting the trial judge to answering written interrogatories.

"The 'overarching objective of the Code of Judicial Conduct is to maintain public confidence in the integrity of the judiciary.'" Presley, 436 N.J. Super. at 447 (quoting In re Advisory Letter No. 7-11 of the Supreme Court Advisory Comm., 213 N.J. 63, 71 (2013)). Courts are concerned with actual bias and the appearance of bias. Id. at 448 (citing Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001)). "[W]ithout any proof of actual prejudice, 'the mere appearance of bias may require disqualification.'" Ibid. (quoting Panitch, 339 N.J. Super. at 67). The appearance of bias alone is not sufficient. Ibid. (quoting Marshall III, 148 N.J. at 279). "[B]efore the court may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable." Ibid. (quoting Marshall III, 148 N.J. at 279). We said in Presley: "The Supreme Court has distilled these principles to this

question: 'would a reasonable, fully informed person have doubts about the judge's impartiality?'" Ibid. (quoting DeNike v. Cupo, 196 N.J. 502, 517 (2008)).

The trial judge's interrogatory answers provided that he would have transferred the case to another judge if he were made aware of the issue or had an independent recollection of Baker. The question is whether defendants are entitled to relief retroactively, now that the trial is completed, the convictions and sentences are affirmed and there is no allegation of actual bias. Given the totality of the circumstances, we agree with the PCR court that no relief is warranted.

As an initial matter, we do not overlook that Baker had ample opportunity to raise this issue to the trial judge and did not. He could have raised it at some point during the lengthy trial, at the point when he was permitted to address the court, or at sentencing. Rule 3:12-4 bars claims that could have been raised but were not. It permits an exception for claims that implicate constitutional rights, but generally, an issue about judicial disqualification does not raise that type of issue. Presley, 436 N.J. Super. at 458 (citing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820-21 (1986)).

The cases cited by Baker do not address his situation. In <u>State v. Tucker</u>, 264 N.J. Super. 549, 553 (App. Div. 1993), the defendant's motion for disqualification was made prior to the commencement of trial. That was not the case here where Baker is seeking to disqualify the judge retroactively, having raised the conflict issue two years after the trial.

In <u>State v. McCann</u>, 391 N.J. Super. 542, 543 (App. Div. 2007), the municipal court judge who issued the search warrant was not a "neutral and detached magistrate" because he previously represented defendant as his attorney in prior matters. The municipal judge "knew or should have known" that defendant had been his client. <u>Id.</u> at 554. That was not the case in Baker's trial.

In <u>Rivers v. Cox-Rivers</u>, 346 N.J. Super. 418, 420 (App. Div. 2001), the matrimonial trial judge previously represented the husband as his attorney in connection with his legal separation. We vacated the trial court's order and remanded the case for consideration by another judge. <u>Id.</u> at 419. These facts have nothing to do with Baker's case.

In <u>State v. Holland</u>, 449 N.J. Super. 427, 436 (App. Div. 2017), the trial judge presided over "the criminal trial of his former criminal client." It was not disputed that all the parties had knowledge about this prior representation at the

22

time of the trial. Id. at 432. We rejected the PCR court's unsupported conclusion that the trial judge was not aware of the prior representation. Id. at 436. The case is factually distinct because, here, there was no indication the parties were aware of the judge's prior involvement and the trial court certified he was not aware and was not so advised.

In Presley, we addressed whether to suppress evidence and dismiss indictments where the trial judge previously prosecuted just one of the defendants in the case and there were no allegations of bias or that the trial judge was aware of the disqualifying conflict at the time the warrants were issued. 436 N.J. Super. at 443. We held that to evaluate whether nullification was necessary to "restore public confidence in the integrity and impartiality of the proceedings, to resolve the dispute in particular and to promote generally the administration of justice," a non-exclusive list of seven factors should be considered. Id. at 461-63 (quoting DeNike, 196 N.J. at 519). We considered that from the perspective of the public, "there is little reason to lose confidence in the integrity of the judicial process when it is undisputed that the judge was unaware of the seven-year-old disqualifying facts and acted in an unbiased manner." Id. at 465. In fact, we were convinced the public might be "dismayed by the effect on the integrity of the judicial process if a defendant were permitted to manipulate the

23

outcomes of prosecutions not tainted by constitutional defect by having the discretion to invoke dispositive claims of judicial disqualification at will." Id. at 465-66. The same applies here.

Eleven years passed between Baker's juvenile cases and his trial in 2008. The judge was not aware of any prior involvement with Baker. The issue was not raised during the trial when the State or judge could have addressed it. There was no bias by the judge and all of Baker's appeal issues about the conviction and sentence were addressed and affirmed. Baker had many opportunities to raise this issue. The State likely would be prejudiced if records no longer exist or witnesses are not available if we were to reverse.

Baker provided no corroboration for his claim that he advised his attorney about this issue prior to trial. He concedes there was no proof of actual bias by the judge. He has not argued or shown that the result of the trial would have been different had the alleged conflict been disclosed.

We are satisfied based on the totality of the facts that denial of Baker's PCR will not erode the public's confidence in the integrity of the judiciary and that Baker's fair trial rights were not violated. He did not show he was prejudiced or that the result of the proceeding would have been different. Without a prima facie case of ineffective assistance of counsel, an evidentiary

hearing was not warranted. See Preciose, 129 N.J. at 462; R. 3:22-10(b). Baker's remaining arguments lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

B

Reeves complains that at a pre-trial proceeding, his attorney required him to confess to shooting Vasquez, that he was not told about his right to remain silent, and he felt compelled to testify at trial because he already had confessed. He argues his trial attorney failed to ask for a mistrial or the removal of a juror who, contrary to court instruction, researched certain issues on the internet and then shared that information with other jurors. He asserts that his attorney should have asked the trial judge to recuse himself. Reeves argues the PCR court erred by denying his request for an evidential hearing.

During jury selection, Reeves raised the defense of duress for the first time. The trial judge permitted Reeves to advance this defense, over the State's objection, even though it was asserted well after the time allowed by the Rules. See R. 3:12-1 (requiring a defendant to notify the State "[n]o later than seven days before the Initial Case Disposition Conference" if asserting the defense of duress under N.J.S.A. 2C:2-9(a)). The State suggested Reeves make a proffer to the court in support of this defense to address its need for discovery. Reeves

acknowledged that he understood that this defense would include his acknowledgement that he fired the shots. There is no indication he was required to confess.

The issue in In re Mandell, 250 N.J. Super. 125 (App. Div. 2009), cited by defendant, is inapposite. The issue in Mandell was whether an attorney could be punished for contempt by not revealing prior to trial whether her client would testify at trial. We noted that "a defendant is not obligated to give the State advance notice of intention to testify or not testify" and that "[t]he State was not entitled to that information until it rested." Id. at 131. Mandell did not address whether defendant's pre-trial proffer could be used at trial.

Before Reeves testified at the trial, he acknowledged to the trial judge he was aware he had the right not to testify. There was no discussion that his pre-trial proffer would be used against him if he did not testify. We agree with the PCR court that Reeves did not show his attorney's performance on this issue was below an objective standard of professional performance. Reeves was not forced to make the proffer and had the choice whether to testify at trial.

Reeves argues he should have had an evidentiary hearing on whether his attorney was ineffective because his attorney did not ask for a mistrial based on juror misconduct or ask to have that juror removed, nor did the attorney consult

with him regarding those issues. During deliberations, one of the jurors passed a note that said another juror conducted research on the internet about gangs and shared that information with other jurors. This was done despite the trial court's repeated instruction to the jurors not to conduct their own research. The court interviewed the two jurors and conducted voir dire of the remaining jurors. Although not all the jurors were aware of the research,

> [a]ll the jurors told the court that they could disregard the information obtained from the internet, that they could reach a decision based solely on the evidence, and that nothing occurred that would prevent them from being fair and impartial. The court instructed them not to discuss the matter further.
>
> [Scott II, slip op. at 86.]

We agree with the PCR court that Reeves' claim is procedurally barred by Rule 3:22-5, which precludes Reeves from seeking post-trial relief on the same issue previously adjudicated. See Preciose, 129 N.J. at 476 (citing R. 3:22-5) (providing that "a prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction relief"). Issues that are "identical or substantively equivalent" to issues previously adjudicated will similarly be precluded. See McQuaid, 147 N.J. at 484 (citing Picard, 404 U.S. at 276-77; Bontempo, 170 N.J. Super. at

27                                                                  A-4765-15T2

234).  We rejected Reeves' claim in his direct appeal that this issue warranted reversal of his conviction based on plain error.  Scott II, slip op. at 86-87.

Reeves also did not satisfy the second part of Strickland that required him to show the result of the proceeding would be different but for his counsel's ineffective assistance.  Each of the jurors answered the trial court that they could disregard the information and would decide the case based on the evidence.  Reeves acknowledged he shot Vasquez and there was other corroborating testimony.

Reeves also claimed ineffective assistance of counsel because his attorney did not request the trial judge to disqualify himself.  Prior to jury selection, the trial judge advised the parties by letter, he had been informed that Reeves previously was a participant in a community-based mentoring program called Omega XIII.  The trial judge had been involved in that program since the mid-1980s, but had no "independent recollection" that Reeves was a participant.  The letter said he kept a distance from the participants as a whole and would recuse himself and leave if they discussed particular criminal cases.  At some point, Reeves left the program.  The trial judge advised he did not see a basis for disqualification, but asked counsel for their position on that issue.  Reeve's counsel subsequently informed the court that he had spoken with his client and

"[f]or the record, he does remember you, and has no objection to you remaining as judge in this case."

Six years later in his PCR petition, Reeves claimed for the first time that the trial judge expelled him from the Omega XIII program, and told him not to return because he was a "bad influence." He contends he told his trial counsel this. Reeves also alleges that as part of the program, he interacted with the trial judge on multiple occasions including going to a NCAA game and a banquet. He said the judge spoke to his mother. The trial judge's answers to interrogatories said he had no recollection of any of these events.

We agree with the PCR court that this did not warrant PCR relief or an evidentiary hearing. Reeves' counsel indicated that he had spoken with Reeves who had no objection to the trial court continuing to hear the case. Reeves' admitted shooting Vasquez. Numerous other witnesses implicated Reeves in Vasquez's shooting. There was no reasonable probability that the result of the proceeding would be different given the evidence.

Reeves argues on appeal that the trial judge showed bias by ruling against him on motions. He certainly had the opportunity to raise this issue in his direct appeal and did not. In his PCR petition he provided no substance to support his claim. The fact that rulings were adverse did not make them wrong or biased.

We agree with the PCR court that Reeves simply did not show that his fair trial rights were violated when the trial judge did not disqualify himself for a conflict based on his involvement with the Omega XIII program. We are satisfied as well that the trial judge's participation in the program would not cause a reasonable, informed person to have doubts about the judge's impartiality nor that Reeves' fair trial rights were violated.

Reeves also claimed he was deprived of a fair trial because of the trial judge's involvement in prosecuting Baker as a juvenile. The PCR court correctly rejected this claim by applying Presley, 436 N.J. Super. 440. In Presley, we determined that a judge with "a disqualifying conflict as to one defendant is an insufficient basis for the other defendants to seek nullification of orders entered by the judge," in the absence of constitutional defect. Id. at 453.

Under Presley, Reeves cannot impute a vicarious conflict based on Baker's past juvenile history. The trial judge did not demonstrate bias toward Baker, Scott or Reeves based on Baker's cases as a juvenile, he was not aware of this claim during Baker's trial, and he did not recognize Baker.

Reeves argues the PCR court erred by denying his petition because the State withheld exculpatory evidence in violation of Brady.[9] He claims he did

---

[9] 373 U.S. at 87.

not have a copy of a letter from Powell or of an affidavit from Hardy. Powell's undated letter was written to a different Superior Court judge, and professed Powell's innocence of the charges then pending against him and offered to cooperate. The letter did not reference Reeves or Scott or reveal any information about their participation in the death of Vasquez. Hardy's affidavit, dated August 4, 2009, said that Powell would do anything to help himself, including "lie on other inmates." However, the jurat dated in 2008 raised issues about the affidavit's authenticity.

The PCR court correctly rejected Reeves' request for an evidentiary hearing. Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To show entitlement to relief under Brady, a "defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material." State v. Martini, 160 N.J. 248, 268-69 (1999) (citing Moore v. Illinois, 408 U.S. 786, 794-95 (1972)). There must be some knowledge by the State regarding the evidence at issue. United States v. Agurs, 427 U.S. 97, 103 (1976). "[T]he contested evidence must at least be 'in [the prosecutor's] file.'"

State v. Carter, 85 N.J. 300, 313 (1981) (second alteration in original) (citing Agurs, 427 U.S. at 110).

Reeves did not show proof that the Powell letter or Hardy affidavit were in the State's possession or that it was even aware of them. It is not clear whether the Hardy affidavit was authentic based on its dates.

Neither the letter nor affidavit was material, meaning "whether there is 'a reasonable probability' that if the evidence had been disclosed 'the result of the proceeding would have been different.'" State v. Mustaro, 411 N.J. Super. 91, 101 (App. Div. 2009) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Powell was attesting to his innocence in his letter, not to Reeves'. Powell was cross-examined at trial about the claim in Hardy's affidavit that he was lying. Therefore, the affidavit added nothing new on the credibility issue.[10]

We are satisfied that Reeves did not make out a prima facie claim for PCR relief and that the PCR court appropriately determined an evidentiary hearing was not needed. See Preciose, 129 N.J. at 462; R. 3:22-10(b). Reeves' remaining arguments lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

---

[10] Reeves also could have raised the issue in his direct appeal but did not. See R. 3:22-4 (providing any ground for relief not raised in a direct appeal will be barred from subsequently being brought in a PCR petition).

C

Scott argues that because the trial court had prior involvement with Baker's cases as a juvenile and the mentoring program that Reeves attended, that he was entitled to PCR relief because of a "shroud of impropriety." We held in Presley that there is an insufficient basis for a co-defendant, who is not directly involved with the conflict, to seek to nullify judicial orders, absent a constitutional defect. 436 N.J. Super. at 453. The same applies here where the decision was by a jury. We already rejected these claims by Baker and Reeves. There was no constitutional defect.

Scott contends the PCR court should have ordered an evidentiary hearing to enable defendants to cross-examine the trial judge. He argues the evidentiary hearing could have been used to develop evidence about the trial judge's "partiality." Scott complains an evidentiary hearing was needed to explore why the State failed to produce the Powell letter and Hardy affidavit.

A PCR court need not conduct an evidentiary hearing unless a defendant establishes a prima facie case for relief, "there are material issues of disputed fact that cannot be resolved by reference to the existing record, and . . . an evidentiary hearing is necessary to resolve the claims for relief." R. 3:22-10(b). Defendant must show "a reasonable likelihood that his or her claim will

ultimately succeed on the merits." Marshall III, 148 N.J. at 158. Our review is de novo. State v. Parker, 212 N.J. 269, 278 (2012).

The court rules "do not contain any provision authorizing discovery in PCR proceedings," Marshall III, 148 N.J. at 268, but courts have "the inherent power to order discovery when justice so requires." Id. at 269 (quoting State ex rel W.C., 85 N.J. 218, 221 (1981)). In the unusual case where a PCR court will require discovery, it is to be "narrow and limited," and not a means "for investigating possible claims, but . . . vindicating actual claims." Id. at 270 (quoting People v. Gonzalez, 51 Cal. 3d 1179 (1990)).

The PCR court did allow limited discovery on the claims that the trial judge had prior involvement with Baker and Reeves. We have no quarrel with the type and scope of discovery allowed by the PCR court in light of the remoteness of the court's alleged involvement, the tardy presentation of the issues to the court and failure to allege any actual bias by the trial judge. Scott and the other defendants did not show good cause to compel any further discovery.[11] He also did not show prima facie proof that he had ineffective

---

[11] Scott's claim that he was denied effective assistance of his PCR counsel because he could not conduct further discovery does not warrant discussion in this written opinion. R. 2:11-3(e)(2).

assistance of trial counsel. The PCR court was not required to conduct an evidentiary hearing.

Scott claims he should have had an evidentiary hearing on his claim that the Powell letter and Hardy affidavit were withheld, but he presented no evidence that the State was aware of these documents or that they would have changed the outcome of the trial.

The PCR court denied Scott's request to recuse itself from hearing further PCR proceedings. Citing Rule 1:12-1(g), Scott alleges a "shadow of impropriety" was cast over the PCR petition by the PCR court's suggestion that Scott and Reeves might not have standing to raise Baker's and Reeves' conflict issues and its limitation on the scope of discovery. In fact, they do not have standing under Presley. Scott's argument is not supported by our independent review of the record.

Scott's remaining arguments lack merit in light of our opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

35

A-4765-15T2

(1)     June 1, 1998 letter from an assistant deputy public defender (ADPD) to the court objecting to the disclosure of information related to Baker in Docket No. FJ-2690-98. The letter was copied to assistant prosecutor Daniels.

(2)     June 19, 1998 letter from an ADPD confirming another attorney was taking over Baker's case in Docket No. FJ-2690-98. The letter is copied to the court and supervising assistant prosecutor Daniels.

(3)     Undated letter from an ADPD to the court objecting to the disclosure of information related to co-defendant Baker in Docket No. FJ-15-2084-97. The letter was copied to supervising assistant prosecutor Daniels.

(4)     November 19, 1993 letter from an ADPD to assistant prosecutor Daniels notifying him of representation of Baker in Docket No. FJ-1249-94.

(5)     Handwritten notes from an unknown author concerning a juvenile matter involving Baker. Assistant prosecutor Daniels' name is written on one of the documents.

(6)     August 5, 1994 juvenile information disclosure notice signed by supervising assistant prosecutor Daniels. The notice does not reference Baker.

(7)     Time sheet for an unknown matter, presumably from the public defender, spanning October 1994 to 1995. The time sheet lists two one-hour "consultations" with assistant prosecutor Daniels.

(8)     August 1996 Notice of Disclosure of Juvenile Information, which is signed by supervising assistant prosecutor Daniels. The notice simply recites N.J.S.A. 2A:4A-60(f) and does not reference Baker.

(9)     December 1, 1993 court appearance sheet for matter Docket No. FJ-1249-94, referenced in (4) above. The sheet indicates the matter was a detention hearing and plea. The sheet lists assistant prosecutor Daniels. In the notation section, the handwritten notes discuss the probation officer's

attempts to get Baker two residential programs and the need to provide discovery.

(10)     November 17, 1993 court appearance sheet for a detention hearing in Docket No. FJ-1249-94, referenced in (4) above. The sheet lists assistant prosecutor Daniels. In the notation section, the handwritten note states: "Remand. [illegible] report to court to determine whether house arrest is appropriate."

(11)     Undated handwritten notes from an unknown author regarding Docket No. FJ-1249-94.

(12)     April 12, 1994 letter from an unknown ADPD to assistant prosecutor Daniels notifying him that the Public Defender's Office was retained to represent Baker in Docket No. FJ-2350-94.

(13)     Juvenile Investigations Unit cover sheet containing several handwritten notes regarding Docket No. FJ-2690-98 involving Baker. It states the prosecutor assigned as "Daniels," however, an unknown author crossed out "Daniels" and wrote "Jackson" above the edit.

(14)     July 2, 1998 letter from the court to a Ms. Wilson concerning Baker in Docket No. FJ-15-2690-98. The letter advised Wilson of her right to refer the claim of ineffective assistance of Baker's counsel to the Attorney Ethics Committee. The letter was copied to the prosecutor's office and the assistant prosecutor Daniel's name is handwritten on the letter.

(15)     Juvenile Waiver to Adult Court regarding Baker in Docket No. FJ-2690-98.

(16)     Undated juvenile prosecution calendar that lists assistant prosecutor Daniels for Docket No. FJ-2690-98, the case in which Baker was waived to adult court.

(17)     January 3, 1995 court appearance sheet that lists assistant prosecutor Daniels. In the notation section it states, "1/23/95 dismissal as part of a plea agreement."

(18)     February 14, 1995 court appearance sheet for Docket Nos. FJ-1642-95 and FJ-2227-95 that list assistant prosecutor Daniels.  The notation section on each sheet states, "[two] y[ea]rs to Jamesburg.  Field placement with mental health component.  State decided not to disclose because possible extraordinary harm to [illegible]—Mental health treatment needed."  It is signed with assistant prosecutor Daniels' initials.

(19)     Juvenile delinquency case disclosure form setting forth the disposition of Docket No. FJ-1642-95.  It is signed in assistant prosecutor Daniels' initials.

(20)     January 30, 1996 letter to Baker denying him entry to the Juvenile Intensive Supervision Program.  A handwritten note on the letter is addressed to assistant prosecutor Daniels' initials.  It states, "what do I do with this?"  A handwritten response states, "[p]lease file."

(21)     Juvenile Delinquency Public Disclosure form for Baker in Docket No. FJ-1269-97.  A different assistant prosecutor is listed.

(22)     October 18, 1996 letter to the court from an ADPD objecting to the disclosure of Baker's identity in Docket No. FJ-1269-97.  The letter is copied to supervising assistant prosecutor Daniels.

(23)     Notice of Parole Release for Baker in Docket No. FJ-1269-97 signed in assistant prosecutor Daniels' initials.

(24)     October 10, 1996 court appearance sheet for a detention hearing in Docket No. FJ-1269-97 that lists assistant prosecutor Daniels.  It states the juvenile was remanded and sets a second hearing date.

(25)     Four juvenile complaints filed by assistant prosecutor Daniels against Baker in connection with Docket No. FJ-98-04-59.  The search warrant issue date for each complaint is listed as September 9, 1997.

(26)     April 27, 1998 letter to assistant prosecutor Daniels advising the "case is good against Baker" in Docket No. FJ-2690-98.

(27) September 27, 1994 letter from an ADPD advising of his representation of Baker in Docket No. FJ-666-95. In a handwritten note, assistant prosecutor Daniels is mentioned as having the case.

(28) January 23, 1995 court appearance sheet in Docket No. FJ-1642-95 that lists assistant prosecutor Daniels. A handwritten note indicates count one to be dismissed and count two "guilty," with assistant prosecutor Daniels "to handle sentence."

A-4765-15T2